

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
12/21/2007

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WILLIAM C. BOSSART AND** | § | **Case No. 05-34015-H4-7** |
| **MARILYNN W. BOSSART,** | § | |
| | § | **Chapter 7** |
| *Debtors.* | § | |
| **KENNETH R. HAVIS,** | § | |
| **CHAPTER 7 TRUSTEE,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **AIG SUNAMERICA LIFE** | § | **Adversary No. 06-3540** |
| **ASSURANCE COMPANY,** | § | |
| | § | |
| *Defendant,* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **WILLIAM C. BOSSART AND** | § | |
| **MARILYNN W. BOSSART,** | § | |
| | § | |
| *Intervenor-Defendants.* | § | |

## MEMORANDUM OPINION ON TRUSTEE'S FIRST AMENDED COMPLAINT
### [Adversary Docket No. 42]

**I.       Introduction**

This Adversary Proceeding concerns a dispute over an annuity purchased by William C.

Bossart and Marilynn W. Bossart (the Debtors) on the eve of bankruptcy.  Kenneth R. Havis, the

Trustee (the Trustee) in this Chapter 7 case, initiated this lawsuit against AIG SunAmerica Life

Assurance Company (AIG) to recover proceeds that the Debtors had transferred to AIG to purchase

an annuity (the Annuity).  AIG, not wanting to become embroiled in litigation, converted the Annuity

into cash (the Funds) and deposited the Funds into the registry of the Court. Meanwhile, the Debtors intervened, taking the position that they had purchased the Annuity on the advice of their attorney and the Funds properly belong to them as exempt property. The Trustee has asserted that the Debtors' transfer to AIG is avoidable under 11 U.S.C. § 548[1] as a fraudulent conveyance and that the estate, not the Debtors, is entitled to the Funds. The Court has decided to issue a memorandum opinion on this dispute because it involves an important pre-bankruptcy planning issue: to what extent may a debtor assert that a challenged transfer is not fraudulent if it is made in reliance on an attorney's advice?

As a preliminary matter, the Court observes that the case at bar was filed before the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), and under the pre-BAPCPA Code, pre-petition planning to enhance exemptions was considered appropriate. Indeed, even a debtor's conversion of nonexempt assets into an exempt annuity on the eve of bankruptcy was not necessarily fraudulent as to creditors. *See NCNB Texas Nat'l Bank v. Bowyer* (*In re Bowyer*), 932 F.2d 1100, 1102 (5th Cir. 1991). The Debtors did much more than purchase an annuity on the eve of bankruptcy, however. They also failed to disclose all the transactions relating to the purchase of the annuity as well as all of their personal property. Additionally, they failed to disclose all of their actions to their own bankruptcy attorney, and they kept or spent all of their nonexempt property. The Debtors defend their actions by saying all of their mistakes were innocent, made in ignorance, or committed due to poor attorney advice. As discussed in detail below, the Court disagrees. The

---

[1] Unless otherwise noted, all section references hereinafter shall refer to 11 U.S.C., and all references to the "Code" or the "Bankruptcy Code" shall refer to the United States Bankruptcy Code. All references shall be to the version of the Code in effect when the main case was initiated on March 18, 2005—i.e., prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA ).

Debtors may have received some bad advice from their bankruptcy attorney, but they were more than ready to hear it.

The Court conducted a two-day trial on this adversary proceeding. The Court admitted exhibits, heard testimony and also heard oral arguments from counsel for the Debtors and counsel for the Trustee. The Court then took the matter under advisement. The Court now makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 as incorporated into Federal Rule of Bankruptcy Procedure 7052. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II.  Findings of Fact

1.  On March 9, 2005, the Debtors retained Harlan Guettermann (Guettermann) as their bankruptcy counsel. Guettermann's employment contract specifically provided that the Debtors were to pay him $2,500.00 for pre-bankruptcy planning and $1,500.00 for filing the bankruptcy. [Adversary Docket No. 44 ¶ 10; Trustee's Ex. 2.]

2.  On March 11, 2005, based upon pre-bankruptcy planning advice from Guettermann, the Debtors used the balance of a non-exempt bank account held jointly by Ms. Bossart and her brother to purchase a cashier's check in the amount of $90,915.37. [Adversary Docket No. 44 ¶ 11; May 29, 2007 Hr'g Tr. 29; Trustee's Ex. 5-6.] The cashier's check was deposited into the Debtors' account at Edward Jones (the Edward Jones Account) on March 15, 2005. [Adversary Docket No. 44 ¶ 11; Trustee's Ex. 9.]

3

3.      Guettermann directed the Debtors to annuity products sold by AIG. [May 29, 2007 Hr'g Tr. 146-48; Trustee's Ex. 10.]   In an email communication on March 13, 2005 between Guettermann and Ms. Bossart, Ms. Bossart stated that "with your approval, an annuity is the way to handle things." [Trustee's Ex. 11.]

4.      On March 15, 2005, the Debtors sold a non-exempt trailer to Ted Sims for $12,000.00. [Adversary Docket No. 44 ¶ 12; May 29, 2007 Hr'g Tr. 49-50; Trustee's Ex. 7.] The funds from this sale were deposited into the Edward Jones Account on March 15, 2005. [Adversary Docket No. 44 ¶ 12; Trustee's Ex. 9.]

5.      On March 16, 2005, Ms. Bossart purchased a single premium annuity from AIG for $102,915.37 (the Annuity).   Less the 3.5% sales charge of $3,602.03, the value of the Annuity at the time of purchase was $99,313.34.   Under the terms of the Annuity, Ms. Bossart would not begin receiving payments until August 3, 2033, when both of the Debtors would be in their 90s. The terms of the Annuity also provided that Ms. Bossart could make withdrawals from the Annuity at any time and in any amount, without penalty.  [Trustee's Ex. 12.]

6.      Ms. Bossart testified that she knew she could cash out the annuity or "withdraw from it at any time," and in fact intended to withdraw money from the Annuity "bit by bit" to provide for medical costs and other post-petition expenses as needed.  [May 29, 2007 Hr'g Tr. 59, 63.]

7.      On March 17, 2005, the Debtors withdrew $5,500.00 from their checking account at Wells Fargo Bank (the Wells Fargo Account) and purchased a cashier's check in the same amount.

4

The Debtors then deposited this $5,500.00 cashier's check into the Edward Jones Account. [Jun. 11, 2007 Hr'g Tr. 48-49; Adversary Docket No. 16.]

8.   On March 18, 2005, the Debtors transferred $5,500.00 from the Edward Jones Account to AIG, thereby making an additional $5,500.00 contribution to the Annuity. [Jun. 11, 2007 Hr'g Tr. 53; Adversary Docket No. 16.]

9.   The parties agree that the Debtors' collective payments to AIG constituted a transfer as defined in 11 U.S.C. § 101(54). [Adversary Docket No. 44 ¶ 21.[2]]

10.   On March 18, 2005, the Debtors filed a voluntary Chapter 7 petition along with their schedules. The Debtors' largest creditor is the IRS. In their Schedule C, the Debtors claimed the Annuity as exempt under § 1108.051 of the Texas Insurance Code. [Docket No. 1.] The Trustee did not object to the Debtors' exemptions, and the Debtors' exemptions were therefore allowed. [Adversary Docket No. 44 ¶ 14.]

11.   The Debtors admitted that the funds they used to purchase the Annuity constituted substantially all of their nonexempt property. [Adversary Docket No. 51 ¶ 67.]

12.   The Debtors admitted that they were insolvent at the time of the purchase of the Annuity. [Adversary Docket No. 44 ¶ 16.]

13.   The Debtors admitted that they purchased the Annuity just prior to filing their Chapter 7 petition. [Adversary Docket No. 51 ¶ 70.]

14.   The Debtors admitted that their purpose in purchasing the Annuity was to place the Funds beyond the reach of their creditors and the Trustee. [May 29, 2007 Hr'g Tr. 38-39, 85-87.]

---

[2] Docket No. 44, the Joint Pretrial Statement, contains a typographical error such that two separate paragraphs are numbered ¶ 21. The instant reference is to the second ¶ 21, under "Agreed Applicable Propositions of Law."

15.   The Debtors failed to file their personal tax returns (Form 1040) for the years 1995, 1996, 1997, 1998, and 1999. [May 29, 2007 Hr'g Tr. 23, 85; Trustee's Ex. 3.] Prior to the filing of the Debtors' Chapter 7 petition, the IRS had placed a tax lien on the Debtors' homestead for their failure to pay taxes. [May 29, 2007 Hr'g Tr. 33-34.]

16.   Mr. Bossart testified that he was "in fear that the IRS was going to take all of our personal property. They had already, as far as I was concerned, taken my house. I was going to lose everything inside it next, I thought." [May 29, 2007 Hr'g Tr. 74-75.] He added that their objective was to get away from the IRS. [May 29, 2007 Hr'g Tr. 82.] Mr. Bossart further testified that the Debtors' pre-bankruptcy planning only commenced after their negotiations with the IRS regarding payment of back taxes had collapsed. [May 29, 2007 Hr'g Tr. 83.]

17.   The Debtors admitted that the IRS' action against them was equivalent to being threatened with a lawsuit. [Adversary Docket No. 51 ¶ 66.]

18.   Although the IRS held a tax lien on the Debtors' homestead, the Debtors did not list the IRS as a secured creditor in their Schedule D; instead, the Debtors listed the IRS as an unsecured creditor in their Schedule E. [Docket No. 1.]

19.   In their answer to Question 10 ("Other Transfers"), the Debtors' Statement of Financial Affairs (SOFA) disclosed only one transfer: the March 15, 2005 sale of a trailer to Ted Sims for the sum of $12,000.00. The Debtors did not disclose that on March 15, 2005, they deposited these proceeds into the Edward Jones Account. They also did not disclose that they used these proceeds the next day in their purchase of the Annuity. [Docket No. 1.]

6

20. Guettermann advised the Debtors to sell the trailer, counseling that if they kept it and filed a bankruptcy petition, the trailer would become part of the estate. [May 29, 2007 Hr'g Tr. 51, 151-53.]

21. In their answer to Question 11 ("Closed Financial Accounts"), the Debtors' SOFA disclosed that on March 7, 2005, they closed a savings account at Fifth Third Bank (the Fifth Third Account) containing a balance of $90,772.44. The Debtors did not disclose that they used these monies, together with the $12,000.00 proceeds from the sale of the trailer, to purchase the Annuity on March 16, 2007. [Docket No. 1.]

22. In their schedules and SOFA, the Debtors did not disclose that they had taken $5,500.00 from the Wells Fargo Account to make an additional contribution to the Annuity on March 18, 2007. [Docket No. 1.] The Debtors did not tell Guettermann about the $5,500.00 transfer to AIG, either; Mrs. Bossart testified that they made the transfer of their own accord. [June 11, 2007 Hr'g Tr. 48.]

23. The Debtors' only disclosure regarding the Annuity in the Schedules came in Schedules B and C, where the Debtors represented that they owned, and claimed as exempt, an annuity in the amount of $108,417.37. [Docket No. 1.]

24. During the creditors' meeting held on April 19, 2005, the Debtors told the Trustee that they had purchased the Annuity with money Ms. Bossart had inherited from her mother in 2000. [Apr. 19, 2005 Mt'g Tr. 2.]

25. The Debtors testified that they considered the Annuity to be Ms. Bossart's retirement money, willed from her mother for that specific purpose. [May 29, 2007 Hr'g Tr. 67.]

26.  Guettermann advised the Debtors to purchase the Annuity based upon research that he had undertaken. He informed the Debtors that if they kept funds in the account that Ms. Bossart held jointly with her brother and then filed bankruptcy, the funds would go to the Trustee. Guettermann also advised the Debtors that if they purchased the Annuity, there was a possibility that the Trustee could challenge the purchase. [May 29, 2007 Hr'g Tr. 146-48, 173.]

27.  Guettermann did not tell the Debtors that they needed to disclose the purchase of the Annuity in their answer to Question 10 of the SOFA. At trial, when the Trustee's counsel asked why he did not advise them to do so, Guettermann testified: "I had never considered writing a check as a transfer." [May 29, 2007 Hr'g Tr. 161.]

28.  In their Schedule B, the Debtors disclosed that they owned four vehicles: a 2002 Ford F250, a 1978 MGB, a 1997 Oldsmobile Cutlass, and a 1928 Ford Model A roadster. In their Schedule C, the Debtors claimed as exempt the Ford F250 and the Ford Model A roadster. [Docket No. 1.] The Debtors did not turn over to the Trustee the two nonexempt vehicles (i.e., the 1978 MGB and the 1997 Oldsmobile Cutlass). Rather, without disclosing their actions to the Trustee or to their creditors, the Debtors stored the MGB in a friend's barn, and traded in the Cutlass as part of a transaction involving their purchase of a new vehicle. [May 29, 2007 Hr'g Tr. 28-29, 64, 79, 165.]

29.  Guettermann did not advise the Debtors to turn over the nonexempt 1978 MGB or the 1997 Oldsmobile Cutlass, despite his knowledge that these vehicles were nonexempt. At trial, when the Trustee's counsel asked Guettermann why he did not advise the Debtors to turn over the nonexempt vehicles, Guettermann testified that the Trustee had not asked the

Debtors to do so, and it is his normal practice to give such advice only if the Trustee affirmatively requests his debtor-clients to turn over property. [May 29, 2007 Hr'g Tr. 162-64.]

30.   Guettermann testified that he did not know that the Debtors had traded in the Oldsmobile Cutlass to purchase a new vehicle. Guettermann also stated that in his opinion, the Code gives debtors the right to trade in a nonexempt vehicle for a new vehicle, even if the Trustee has not filed a notice of abandonment on the nonexempt vehicle. [May 29, 2007 Hr'g Tr. 165-66.]

31.   Ms. Bossart testified that Guettermann did not tell them that the cars belonged to the Trustee: he told them they could exempt two cars, but did not say anything about the two nonexempt vehicles. "Nobody asked for them," she testified.   [May 29, 2007 Hr'g Tr. 28-29.]

32.   In their Schedule B, the Debtors disclosed that they had cash in the amount of $200.00, a balance in the Wells Fargo Account in the amount of $300.00, and balance in a checking account at Amegy Bank (the Amegy Account) in the amount of $200.00. In their Schedule C, the Debtors claimed none of these funds as exempt. [Docket No. 1.] The Debtors did not turn over any nonexempt funds to the Trustee, but rather spent all of these monies soon after filing their Chapter 7 petition. [May 29, 2007 Hr'g Tr. 26-27, 64, 78-79.]

33.   Guettermann did not advise the Debtors to turn over the cash on hand of $700.00 to the Trustee despite Guettermann's knowledge that these funds were nonexempt. At trial, when the Trustee's counsel asked why he did not advise the Debtors to turn over the nonexempt funds, Guettermann again testified that the Trustee had not asked the Debtors to do so, and

it is his normal practice to give such advice only if the Trustee affirmatively requests his clients to turn over the property. [May 29, 2007 Hr'g Tr. 161-62.]

34.  Ms. Bossart testified that the Debtors did not turn over any property to the Trustee.  She stated that she did not understand that the Code required her to turn over nonexempt property to the Trustee; rather, they "assumed that the Trustee would ask for whatever was due." [May 29, 2007 Hr'g Tr. 64.]  Ms. Bossart also testified that she thought that their pre-bankruptcy planning, in which they liquidated their assets into an exempt annuity and paid their creditors nothing, was not fair. [May 29, 2007 Hr'g Tr. 64-65.]

35.  Guettermann testified that he did not recall if he answered the Debtors' specific questions about how much money they should keep in their checking account, if they should leave money for outstanding checks, and how much cash they should keep on hand. [May 29, 2007 Hr'g Tr. 169-71.] Guettermann testified that he told the Debtors that all non-exempt property belonged to the estate and could be taken by the Trustee. [May 29, 2007 Hr'g Tr. 168.]

36.  In their Schedules, the Debtors listed only four debts, all of which they represent as unsecured. Specifically, they set forth that the IRS holds an unsecured claim of $230,000.00, Chase Credit holds an unsecured claim of $49.00, Wells Fargo Card Services (whose address is 7000 Vista Drive, West Des Moines, Iowa) holds an unsecured claim of $15,000.00, and Wells Fargo Card Services (whose address is P.O. Box 5445, Portland, Oregon) holds an unsecured claim in an unknown amount. [Docket No. 1.]

37.  Guettermann testified that while he gave the Debtors legal advice regarding the purchase of the Annuity, it was the Debtors, not he, who made the decision to purchase the Annuity.

10

Guettermann further testified that it was the Debtors' decision to sign off on, and have him file, the Schedules and SOFA with the information contained therein. [May 29, 2007 Hr'g Tr. 171-72.]

38.   Kenneth Lehrer, an economist and retired professor of finance at the University of Houston, testified that an annuity was an investment—a financial instrument sold for equivalent market value. [June 11, 2007 Hr'g Tr. 21.] Lehrer further testified that as of the time of purchase, the Annuity had a value of at least $108,415.00. [June 11, 2007 Hr'g Tr. 26.]

39.   On August 24, 2006, the Trustee initiated this Adversary Proceeding by filing suit against AIG. [Adversary Docket No. 1.] The Trustee seeks to recover the monies paid by the Debtors to AIG for the purchase of the Annuity.

40.   Pursuant to this Court's order of November 21, 2006, AIG deposited into the Court's registry the accumulated cash value of the Annuity. [Adversary Docket No. 25.]

41.   On January 2, 2007, this Court, pursuant to the order of November 21, 2006, dismissed AIG from this Adversary Proceeding with prejudice. [Adversary Docket No. 36.]

42.   Pursuant to this Court's order of November 30, 2006, this Court permitted the Debtors to intervene as party-defendants in this Adversary Proceeding. [Adversary Docket No. 28.]

43.   On December 29, 2006, the Debtors filed their Answer to Complaint. [Adversary Docket No. 34.]

44.   On January 22, 2007, the Trustee filed his Motion for Leave to File First Amended Complaint. [Adversary Docket No. 41.]

45.   On May 11, 2007, this Court granted the Trustee leave to file his First Amended Complaint, which was deemed filed as of May 11, 2007. [Adversary Docket No. 46.]

46. On May 29, 2007 and June 11, 2007, this Court conducted a trial on the First Amended Complaint. The Court admitted exhibits and heard testimony from William C. Bossart, Marilynn W. Bossart, Kenneth R. Havis, Harlan H. Guettermann,[3] and Kenneth Lehrer.[4]

47. On June 7, 2007, between the first and second day of trial, the Debtors filed their First Amended Statement of Financial Affairs (the First Amended SOFA). [Docket No. 13.] In the answer to Question 10 ("Other transfers"), the First Amended SOFA states, among other things, that the Debtors: (1) sold a trailer to Ted Sims for $12,000.00 on March 15, 2005; (2) deposited the $12,000.00 into the Edward Jones Account on March 16, 2005; (3) received a cashier's check from Fifth Third Bank in Ohio in the amount of $90,915.37 on March 11, 2005; (4) deposited the $90,915.37 cashier's check into the Edward Jones Account on March 16, 2007; (5) purchased an annuity from AIG in the amount of $102,915.00 on March 16, 2005; (6) received a cashier's check from the Wells Fargo Account in the amount of $5,500.00 on March 17, 2005; (7) deposited the $5,500.00 cashier's check into the Edward Jones Account on March 17, 2005; and (8) transferred funds in the amount of $5,500.00 from the Edward Jones Account to AIG, thereby making an additional contribution of $5,500.00 to the Annuity. [*Id.*]

48. During the second day of trial, counsel for the Debtors, Guettermann, admitted that "in hindsight, the $5,500.00 should have been reported in Line No. 10 of the [original] Statement of Financial Affairs." [June 11, 2007 Hr'g Tr. 134.] Stating that the Debtors had made an

---

[3] At trial, the Debtors explicitly waived the attorney-client privilege as to Guettermann so that he could testify about the substance of certain conversations that he had with them. [May 29, 2007 Hr'g Tr. 140.]

[4] Lehrer testified as an expert witness about the value of the Annuity. [June 11, 2007 Hr'g Tr. 10.]

"honest mistake," Guettermann observed that "if we hadn't told the Trustee about that $5,500.00 he would never know, because he didn't do any discovery in this case." [June 11, 2007 Hr'g Tr. 140-41.] Guettermann further stated that "[t]he reason we reported it is these clients had never lied to the Court, had never lied to the Trustee, and they're not going to start now." He argued that "to penalize [the Debtors for disclosing the $5,500.00 transfer] would show that no good deed goes unpunished." [June 11, 2007 Hr'g Tr. 141-42.]

49.     On July 11, 2007, one month after the conclusion of the trial, the Debtors filed their Second Amended Statement of Financial Affairs (the Second Amended SOFA). [Docket No. 16.] The Second Amended SOFA discloses, for the first time, the following transactions:

a.      In the answer to Question 3 ("Payments to Creditors"): (1) on March 16, 2005, a payment in the amount of $800.00 to Chase Bank for prescription drugs;[5] and (2) on March 18, 2005, a payment in the amount of $1,500.00 to Dick Austin of United Tax Service.

b.      In the answer to Question 7 ("Gifts"): on June 13, 2004, a check in the amount of $1,000.00 to the Debtors' daughter.

c.      In the answer to Question 10 ("Other Transfers"): (1) on March 18, 2005, a cash withdrawal in the amount of $1,500.00 from the Wells Fargo Account in order to purchase traveler's checks in the amount of $1,500.00; (2) on March 18, 2005, a prepayment in the amount of $960.00 to cover the Debtors' auto insurance premium; (3) on March 16, 2005, a cash withdrawal in the amount of $2,373.00 from the Wells

---

[5] This amount appears to have been a payment to retire the entire balance of the Debtors' credit card; the entry notes that "[a]fter the application of all charges, Debtors had a credit balance of $288.20."

Fargo Account to pay for auto insurance, prescription drugs, and utility bills; (4) on August 28, 2004, a check in the amount of $3,295.00 from the Wells Fargo Account to Thousand Trails NACO Leisure Time (Thousand Trails);[6] and (5) on June 16, 2004, a withdrawal in the amount of $5,000.00 from the Wells Fargo Account, the purchase of a cashier's check in the amount of $5,000.00, the transfer of this cashier's check to a former employee, and the deposit of a personal check in the amount of $5,000.00 into the Wells Fargo Account.

50.     Additionally, on July 11, 2007, the Debtors filed their First Amended Schedule B (the Amended Schedule B).   [Docket No. 15.]    The Amended Schedule B newly lists the following nonexempt personal property as belonging to the Debtors on the petition date: (1) traveler's checks with a value of $1,500.00; (2) a checking account with Wells Fargo Bank with a balance of $538.08;[7] (3) a refund due from Chase Bank (from overpayment) with a value of $288.20; (4) Platinum Membership in Thousand Trails with a value of $3,200.00; and (5) prepayment of an auto insurance premium with a value of $960.00.

## III.    Conclusions of Law

### A.     Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1).  This dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).  Venue is proper pursuant to 28 U.S.C. § 1409.

---

[6] Thousand Trails is a large national private camping club for RV and cabin camping, with more than 80 locations in the United States, including seven in Texas.  *See* Thousand Trails, L.P., *About Thousand Trails*, http://www.1000trails.com/pages/about.htm (last visited Dec. 10, 2007); Thousand Trails, L.P., *Locations*, http://www.1000trails.com/pages/locations.htm (last visited Dec. 10, 2007). According to the Second Amended SOFA, the purpose of the $3,295.00 check was "to upgrade membership."

[7] The Wells Fargo Account was also listed in the original Schedule B, but only with a balance of $300.00. [Docket No. 1.]

**B.      Avoidance of transfers under 11 U.S.C. § 548(a)(1)**

Section 548(a)(1) of the Bankruptcy Code, as of the date the Debtors filed their petition,[8]

provides:

> The trustee may avoid any transfer of an interest of the debtor in
> property, or any obligation incurred by the debtor, that was made or
> incurred on or within one year before the date of the filing of the
> petition, if the debtor voluntarily or involuntarily-
>> (A)   made such transfer or incurred such obligation with
>> actual intent to hinder, delay, or defraud any entity to which
>> the debtor was or became, on or after the date that such
>> transfer was made or such obligation was incurred, indebted;
>> or
>> (B)      (i) received less than a reasonably equivalent value in
>> exchange for such transfer or obligation; and
>>> (ii)      (I) was insolvent on the date that such transfer
>>> was made or such obligation was incurred, or
>>> became insolvent as the result of such transfer
>>> or obligation;
>>> (II) was engaged in business or a transaction,
>>> or was about to engage in business or a
>>> transaction, for which any property remaining
>>> with the debtor was an unreasonably small
>>> capital; or
>>> (III) intended to incur, or believed that the
>>> debtor would incur, debts that would be
>>> beyond the debtor's ability to pay as such
>>> debts matured.

11 U.S.C. § 548(a)(1) (2003).

The Trustee is seeking to recover the Funds under two theories.  First, the Trustee argues that

under § 548(a)(1)(A), the Debtors purchased the Annuity with the actual intent to hinder, delay, or

defraud.  In the alternative, the Trustee argues that under § 548(a)(1)(B), the Debtors made the

transfer for less than reasonably equivalent value.

---

[8] The Debtors filed their Chapter 7 petition on March 18, 2005, prior to the passage of BAPCPA.  Therefore, as previously noted, the Court shall analyze the dispute at bar under the pre-BAPCPA version of the Code.

### 1. The Trustee's theory under § 548(a)(1)(A)

In order to recover the Funds under § 548(a)(1)(A), the Trustee must show three elements: (1) the Debtors made a transfer; (2) within one year of filing their petition; and (3) with actual intent to hinder, delay, or defraud. *Anderson v. Mega Lift Systems, L.L.C. (In re Mega Systems, L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *6 (Bankr. E.D. Tex. Jun. 4, 2007) (citing *Chiasson v. Cardon (In re Accurate Home Inspectors, Inc.)*, 348 B.R. 354, 357-58 (Bankr. E.D. La. 2005)); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991).

#### a. Was there a transfer of interest of the debtor in property?

The parties have stipulated that the payments to AIG constituted a transfer as defined in 11 U.S.C. § 101(54). [Finding of Fact No. 9.] Therefore, the first element is met.

#### b. Was the transfer made on or within one year before the date of the filing of the petition?

The Debtors made payments to AIG on March 16, 2005, and March 18, 2005. [Finding of Fact Nos. 5, 8.] They filed their petition on March 18, 2005. [Finding of Fact No. 10.] Therefore, this transfer was made within one year before the filing of the petition, and the second element is also met.

#### c. Was the transfer made with actual intent to hinder, delay or defraud?

The Trustee has the burden of proof to show actual intent to hinder, delay or fraud under § 548(a)(1)(A). *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 596 (5th Cir. 1996); *Waldron v. Moody Nat'l Bank (In re L&D Interests, Inc.)*, 350 B.R. 391, 399 (Bankr. S.D. Tex. 2006) (citing *In re Zedda*, 103 F.3d 1195, 1203 (5th Cir. 1997)).

16

Because it is usually difficult to present evidence of actual intent to defraud, "actual intent may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005) (quoting *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989)); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997).[9]   When considering such circumstantial evidence, courts have looked to the fraudulent transfer acts of their respective states for indicia, or badges, of fraud. *In re Sissom*, 366 B.R. 677, 693 (Bankr. S.D. Tex. 2007). Using the Texas Uniform Fraudulent Transfer Act (TUFTA) as a starting point, this Court has previously identified the following thirteen badges of fraud as factors showing actual intent to hinder, delay, or defraud:

1. The transfer or obligation was to an insider;
2. The debtors retained possession or control of the property after the transfer;
3. The transfer or obligation was concealed;
4. Before the transfer was made or obligation incurred, the debtors had been sued or threatened with suit;
5. The transfer was of substantially all the debtors' assets;
6. The debtors absconded—i.e., avoided service of process and/or concealed themselves;
7. The debtors removed or concealed assets;
8. The value of the consideration received by the debtors was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. The debtors were insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. The transfer occurred shortly before or shortly after a substantial debt was incurred;
11. The transfer was done just prior to the filing of the debtors' bankruptcy petition;
12. The debtors are unable to explain the disappearance of assets; and
13. The debtors have engaged in a pattern of "sharp dealing" prior to bankruptcy.

*Id.* at 693-94.

The evidence reflects that eight of the thirteen badges of fraud are present in this case.

---

[9] While both *Rodriguez* and *Pratt* involve fraudulent transfers, *Rodriguez* is a § 548(a)(1)(A) case and *Pratt* is a § 727(a)(2) case. Section 548(a)(1)(A) of the Code contains the phrase "with actual intent to hinder, delay, or defraud any entity," and § 727(a)(2) contains the phrase "with the intent to hinder, delay, or defraud a creditor." This Court has previously held that with respect to determining intent, these two statutes can be interpreted identically. *In re Sissom*, 366 B.R. 677, 691-92 (Bankr. S.D. Tex. 2007).

### i. The transfer or obligation was to an insider.

The Debtors transferred funds to AIG, a large, sophisticated financial company. [Finding of Fact Nos. 5, 8.] The Trustee does not contend that the transfer was to an insider, nor is there any evidence indicating such a relationship. Therefore, the first badge of fraud is not present.

### ii. The Debtors retained possession or control of the property after the transfer.

Under the terms of the Annuity, Ms. Bossart would not begin to receive annuity payments until 2033. However, Ms. Bossart could have withdrawn funds from the Annuity at any time, in any amount, and without penalty. [Finding of Fact No. 5.] Ms. Bossart testified that her husband and she knew they could make withdrawals at any time, and intended to withdraw money from the Annuity "bit by bit" to provide for medical costs and other costs as needed. [Finding of Fact No. 6.] The Court finds that the Debtors could withdraw money from the Annuity without penalty and at their own discretion (and intended to do so) and that the Debtors thereby retained control of the Annuity. *In re Jennings*, 332 B.R. 465, 470 (Bankr. M.D. Fla. 2005) (holding that a debtor who could redeem an annuity at any time for a ten percent penalty "retained control over the money used to fund the annuity"). Therefore, the second badge of fraud is present.

### iii. The transfer or obligation was concealed.

The Debtors failed to disclose the existence, timing, and amounts of virtually all the transactions relating to their purchase of the Annuity. In their original schedules and SOFA, the Debtors only disclosed the following: (1) the March 7, 2005 closing of the Fifth Third Account containing a balance of $90,772.44; (1) the March 15, 2005 sale of a trailer to Ted Sims for the sum of $12,000.00; and (3) the ownership of an exempt annuity in the amount of $108,417.37. [Finding

18

of Fact Nos. 19, 21, 23.] During the § 341 creditors' meeting held on April 19, 2005, the Debtors told the Trustee that they had purchased the Annuity with money Ms. Bossart had inherited from her mother in 2000. [Finding of Fact No. 24.]

The Debtors did not disclose that they had waited five years—until two days before filing their Chapter 7 petition—to purchase the Annuity with the money inherited from Ms. Bossart's mother. [Finding of Fact No. 23.] The Debtors did not disclose that they also used the proceeds from the sale of the nonexempt trailer to purchase the Annuity. [Finding of Fact No. 19.] The Debtors did not disclose that they withdrew $5,500.00 from the Wells Fargo account, on the same day they filed their Chapter 7 petition, to make an additional contribution to the Annuity. [Finding of Fact No. 22.]

Because the Debtors did not tie the Annuity's value of $108,417.37 to the trailer sale proceeds of $12,000.00, the closed account proceeds of $90,772.44, or the Wells Fargo transfer of $5,500.00, neither the Trustee nor any creditor reviewing the Schedules and SOFA could easily and quickly discern that the Debtors, in the days immediately prior to filing their petition, had used the $12,000.00, the $90,772.44, and the $5,500.00 to purchase the Annuity.

The Debtors contend that they disclosed sufficient information to put the Trustee on notice about the details surrounding their purchase of the Annuity. The Court does not agree; it is not the Trustee's job to play connect-the-dots with the Debtors' schedules and SOFA. It was the Debtors' duty to make as full and complete a disclosure as possible.[10] The three most important words in

---

[10] The Court finds the following exchange from the creditors' meeting on April 19, 2005 instructive. During the meeting, the Debtors and their counsel, Harlan Guettermann, implied that the Annuity was purchased in 2000, shortly after Ms. Bossart inherited money from her mother. They made no affirmative efforts to disclose that the Annuity was actually purchased in 2005, two days before the petition date.

Trustee:                    OK. When you signed the schedules, were they fully complete and filled out?

bankruptcy are: disclose, disclose, disclose. *In re Sanchez*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007). But instead of making a full and complete disclosure of their financial affairs, the Debtors doled out portions of the truth over a period of two years. One week after the creditors' meeting, the Debtors' attorney supplied the Trustee with a copy of the Annuity paperwork. Over the next year, the Trustee learned the specifics about which funds the Debtors had used to purchase the Annuity and when. And it was not until June 7, 2007—in the middle of trial—that the Debtors filed their First Amended SOFA, in which they revealed that on the same day they filed their Chapter 7 petition, they had also withdrawn $5,500.00 from the Wells Fargo Account and added these monies to the Annuity.[11] [Finding of Fact No. 47.]

---

| | |
|---|---|
| Mr. Bossart: | Yes, sir. |
| Trustee: | Did you carefully review them to make sure all of your assets were listed on these schedules? |
| Mr. Bossart: | Yes, sir. |
| Trustee: | Can you think of any that were left off or need to be amended today? |
| Mr. Bossart: | No, sir. |
| Trustee: | What is Polaris AIG? |
| Ms. Bossart: | That is the . . . that's the company with which I have an annuity for my retirement. |
| Trustee: | And you say it's an annuity. Where did you build up your retirement? |
| Ms. Bossart: | It was willed— |
| Trustee: | —with what company? |
| Ms. Bossart: | No, the retirement was willed to me by my mother when she died in 2000. |
| Trustee: | Oh, it's an inheritance? |
| Ms. Bossart: | It's an inheritance. |
| Trustee: | When did she die? |
| Ms. Bossart: | She died January 10, 2000. |
| Trustee: | In 2000? |
| Ms. Bossart: | 2000. |
| Harlan Guettermann: | She received an inheritance and then purchased the annuity. Ms. Bossart bought the annuity. |
| Ms. Bossart: | I bought the annuity. |
| Trustee: | The—in your Statement of Affairs, in Item 11 which is Closed Financial Accounts, you show that the Fifth Third Bank in Ohio you closed that savings account. Is that the one that came from your mother? |
| Ms. Bossart: | Yes. |

---

[11] The filing of amended schedules does not excuse false statements or omissions in the original schedules; moreover, those amendments carry even less weight when they are made after the falsity has already been revealed. *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 373 (Bankr. S.D. Tex. 2005) (citing *Sholdra v. Chilmark Financial LLP* (*In re Sholdra*) 249 F.3d 380, 382 (5th Cir. 2001)).

The Debtors argue that they did not intend to conceal anything, and that any failure to disclose was an honest mistake. Unfortunately for the Debtors, the facts of this case demonstrate that they failed to make a full and complete disclosure of their financial status, despite ample opportunity to do so. The Court is particularly troubled by the Debtors' failure to reveal the petition-day transfer of $5,500.00 until June 7, 2007.[12] The Debtors made minimal effort to disclose all the transfers leading to the purchase of the Annuity, nor did they make any effort to show the connections among these transfers. *See In re Presto*, 376 B.R. 554, 570 (Bankr. S.D. Tex. 2007) (holding that failing to disclose transfers is just as much an act of concealment as actively hiding them). In sum, the Court finds that the Debtors concealed the purchase of the Annuity, and therefore the third badge of fraud is present.

### iv. Before the transfer was made or obligation incurred, the Debtors had been sued or threatened with suit.

The Debtors failed to file their personal tax returns for tax years 1995 through 1999. Before the Debtors filed their Chapter 7 petition, the IRS placed a tax lien on the Debtors' homestead for their failure to pay taxes. [Finding of Fact No. 15.] Mr. Bossart testified that he was "in fear that the IRS was going to take all of our personal property. They had already, as far as I was concerned, taken my house. I was going to lose everything inside it next, I thought." [Finding of Fact No. 16.] The Debtors agree that the actions of the IRS were equivalent to being threatened with suit, and

---

[12] At trial, counsel for the Debtors admitted that "in hindsight, the $5,500.00 should have been reported in Line No. 10 of the Statement of Financial Affairs." [Finding of Fact no. 48.] He argued that the Debtors should not be judged harshly, because "if we hadn't told the Trustee about that $5,500.00 he would never know, because he didn't do any discovery in this case," adding that "[t]he reason we reported it is these clients had never lied to the Court, had never lied to the Trustee, and they're not going to start now." [*Id.*] While the Court is heartened by the Debtors' commitment to the truth, it does not agree with the Debtors' counsel that "to penalize [the Debtors for disclosing the $5,500.00 transfer] would show that no good deed goes unpunished." [*Id.*] Telling the truth to the Court and making full disclosure on schedules is not a "good deed." It is the duty of every debtor, stated clearly in the Code, and affirmed by every bankruptcy court in the land.

stipulated that this badge of fraud is present. [Finding of Fact No. 17.] Therefore, the Court finds

that the fourth badge of fraud is present.

### v. The transfer was of substantially all the Debtors' assets.[13]

In the two days before filing their Chapter 7 petition, the Debtors transferred nonexempt

property in the amount of $108,415.37 into the Annuity.[14] [Finding of Fact Nos. 5, 7.] According

to their schedules, on the petition date the Debtors only owned nonexempt property in the amount

of $9,421.28.[15] [Finding of Fact Nos. 28, 32, 50.] In other words, in the two days before filing their

petition, the Debtors transferred ninety-two percent (92%) of their nonexempt assets. The Debtors

concede that the transfer consisted of most of the Debtors' nonexempt property, and stipulated that

this badge of fraud is present. [Finding of Fact No. 11] The Court concludes that the transfer was

of substantially all of the Debtors' assets, and therefore the fifth badge of fraud is present.

### vi. The Debtors absconded—i.e., avoided service of process and/or concealed themselves.

The Trustee does not contend that the Debtors absconded, nor is there any evidence

indicating that the Debtors did so. Therefore, the sixth badge of fraud is not present.

---

[13] In the context of this badge of fraud, the Court is only considering the Debtors' nonexempt assets. *Presto*, 376 B.R. at 570.

[14] The Court calculated this amount as follows: $90,915.37 (from the Fifth Third Account) + $12,000.00 (from the sale of the trailer) + $5,500.00 (from the Wells Fargo Account) = $108,415.37.

[15] The Debtors listed the following nonexempt property on their Amended Schedule B: (1) the 1978 MGB, valued at $850.00; (2) the 1997 Oldsmobile Cutlass, valued at $1,685.00; (3) cash, in the amount of $200.00; (4) the balance of the Amegy Account, in the amount of $200.00; (5) the balance of the Wells Fargo Account, in the amount of $538.08; (6) traveler's checks, in the amount of $1,500.00; (7) a credit from Chase Bank, in the amount of $288.20; (8) Platinum Membership in Thousand Trails, valued at $3,200.00; and (9) prepayment of an auto insurance premium, in the amount of $960.00. As previously noted, the Debtors did not disclose that they owned the last four items until one month after the close of trial; they had previously listed the Wells Fargo Account, but only in the amount of $300.00. The Debtors did not turn over any of this nonexempt property to the Trustee, but spent all of the money, kept the Thousand Trails membership, traded in the Oldsmobile for a new car, and kept the MGB in a friend's barn.

### vii. The Debtors removed or concealed assets.

Not only did the Debtors fail to disclose all of the details regarding their purchase of the Annuity, they also failed to turn over their nonexempt assets to the Trustee as required by 11 U.S.C. § 521(4).

Section 521(4) of the Code provides that "the debtor shall . . . surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate." Section 542(a) further provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell or lease . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

Courts have interpreted these Code provisions to mean that "any property of a debtor's estate held by any entity must be turned over to the trustee." *In re NWFX, Inc.*, 864 F.2d 593, 596 (8th Cir.1989). This Court has previously held that "there is no requirement in the Code that the trustee make a demand, obtain a court order, or take any further action in order to obtain a turnover [delivery] of the estate's property." *In re Calvin*, 329 B.R. 589, 600 (Bankr. S.D. Tex. 2005) (quoting *In re U.S.A. Diversified Products, Inc.*, 193 B.R. 868, 872 (Bankr. N.D. Ind. 1995)); *see also Rice v. Johnson (In re Johnson)*, 371 B.R. 380, 387 (Bankr. E.D. Ark. 2007); *In re Bidlofsky*, 57 B.R. 883, 900 (Bankr. E.D. Mich. 1985). The obligation "is self-operative and mandatory." *In re Calvin*, 329 B.R. at 600 (quoting *In re U.S.A. Diversified Products, Inc.*, 193 B.R. at 872).

In their Schedule B, the Debtors disclosed that they owned four vehicles: a 2002 Ford F250, a 1978 MGB, a 1997 Oldsmobile Cutlass, and a 1928 Ford Model A roadster. In their Schedule C, the Debtors claimed the Ford F250 and the Ford Model A roadster as exempt. The Debtors did not

turn over the nonexempt 1978 MGB or the nonexempt 1997 Oldsmobile Cutlass to the Trustee. Rather, without disclosing their actions to the Trustee or to their creditors, the Debtors stored the MGB in a friend's barn, and traded in the Cutlass for a new vehicle. [Finding of Fact No. 28.]

Guettermann did not advise the Debtors to turn over the nonexempt vehicles, despite knowing that they were nonexempt. When the Trustee's counsel asked Guettermann why he did not advise the Debtors to turn over the nonexempt vehicles, Guettermann testified that the Trustee had not asked the Debtors to do so, and it is his normal practice to give such advice only if the Trustee affirmatively requests his clients to turn over the property. [Finding of Fact No. 29.] Guettermann further testified that while he had not known that the Debtors had traded in the nonexempt Oldsmobile Cutlass for a new vehicle, in his opinion the Code did not prohibit such actions. Guettermann further testified that he believed the Code gives debtors the right to trade in a nonexempt vehicle for a new vehicle, even if the Trustee has not filed a notice of abandonment on the nonexempt vehicle. [Finding of Fact No. 30.]

The Debtors testified that Guettermann did not tell them that the cars belonged to the Trustee, and that while he told them they could exempt two cars, he did not say anything about the two nonexempt vehicles. "Nobody asked for them," testified Ms. Bossart. [Finding of Fact No. 31.]

In their original Schedule B, the Debtors disclosed that they had cash in the amount of $200.00, a balance in the Wells Fargo Account in the amount of $300.00, and a balance in the Amegy Account in the amount of $200.00. [Finding of Fact No. 32.] In their Amended Schedule B, filed one month after the close of trial, the Debtors revealed that they also had (1) traveler's checks in the amount of $1,500.00; (2) a refund due from Chase Bank in the amount of $288.20; (3) a Platinum Membership in Thousand Trails NACO Leisure Time with a value of $3,200.00; and (4)

24

a prepaid auto insurance premium in the amount of $960.00. [Finding of Fact No. 50.] The Debtors further revealed that the balance of the Wells Fargo Account was actually $538.08, not $300.00 as previously stated. [*Id.*] In their Schedule C, the Debtors did not claim any of these funds or property as exempt. [Docket No. 1.] However, the Debtors did not turn over any of this nonexempt property to the Trustee and spent all of the funds soon after filing their Chapter 7 petition.[16] [Finding of Fact No. 32, 34.]

Guettermann did not advise the Debtors to turn over the nonexempt property, despite knowing that this property was nonexempt. When the Trustee's counsel asked Guettermann why he did not advise the Debtors to turn over the nonexempt funds, Guettermann testified that the Trustee had not asked the Debtors to do so, and it is his normal practice to give such advice only if the Trustee affirmatively requests his clients to turn over the property. [Finding of Fact No. 33.]

Ms. Bossart testified that she did not understand that the Code required them to turn over nonexempt property to the Trustee; they "assumed the Trustee would ask for whatever was due." [Finding of Fact No. 34.] Guettermann testified that he did not recall if he answered the Debtors' specific questions about how much money they should keep in their checking account, if they should leave money for outstanding checks, and how much cash they should keep. [Finding of Fact No. 35.]

The Debtors admit that instead of turning over nonexempt property to the Trustee, they used it for their own benefit. They traded in the Oldsmobile for a new car, stored the MGB in a friend's

---

[16] As the Debtors did not file their Amended Schedule B until after the close of trial, the Trustee did not—and could not—adduce testimony regarding the disposition of the personal property disclosed for the first time therein. The Debtors did, however, testify that they did not turn over any nonexempt property to the Trustee, and spent all of their nonexempt cash soon after filing their Chapter 7 petition. [May 29, 2007 Hr'g Tr. 78.]

barn, kept their membership in Thousand Trails, and spent the cash.[17]  Even if Guettermann did not

instruct the Debtors of their affirmative duty to turn over nonexempt property to the Trustee, he did

tell them about the difference between exempt property and nonexempt property.  Guettermann and

the Debtors reiterated on several occasions that the Trustee did not ask them to turn over their

nonexempt property.  But the Code and the opinions interpreting the Code are clear on this point:

it is the Debtors' affirmative responsibility to turn over their nonexempt property, and not the

Trustee's responsibility to ask them to do so.  *In re Calvin*, 329 B.R. at 600; *see also Knaus v.*

*Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989).  It does not matter

whether the Trustee asked for the property.

The uncontested facts are that the Debtors took property of the estate and used it for their

own benefit.  Therefore, the seventh badge of fraud is present.

### viii. The value of the consideration received by the Debtors was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

On March 16, 2005, Ms. Bossart purchased the Annuity from AIG for $102,915.37.  After

subtracting AIG's 3.5% sales charge of $3,602.03, the value of the Annuity at the time of purchase

was $99,313.34.  [Finding of Fact No. 5.]  Pursuant to the terms of the contract, AIG also imposed

a 3.5% sales charge on the Debtors' $5,500.00 transfer of March 18, 2005, resulting in a deposit of

$5,307.50 into the Annuity.  Thus, as of the petition date, the value of the Annuity was $104,620.84

($99,313.34 + $5,307.50).  Under the terms of the Annuity, Ms. Bossart could withdraw any amount

of funds from the Annuity at any time thereafter, without penalty.  [*Id.*]  The Court finds that the

---

[17] Because the Debtors did not file their First Amended Schedule B and Second Amended SOFA until one month after the close of trial, no evidence was presented on the specific disposition of the property newly disclosed therein.  That being said, the record is clear that the Debtors never turned over any property to the Trustee.

26

value that the Debtors received ($104,620.84, plus the ability to withdraw any amount of funds from the Annuity at any time, without penalty) was reasonably equivalent to the value of the asset transferred ($108,415.37 in cash). *Jimmy Swaggart Ministries v. Hayes* (*In re Hannover Corp.*), 310 F.3d 796, 802 (5th Cir.2002) (citing *Butler Aviation Int'l, Inc.* v. *Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1127 (5th Cir. 1993)) (holding that the test for reasonably equivalent value under § 548 is "whether the transfer conferred an economic benefit on the debtor"); *In re Fairchild Aircraft Corp.*, 6 F.3d at 1125 (holding that "reasonably equivalent value" does not mean dollar-for-dollar equivalence). Therefore, the eighth badge of fraud is not present.

### ix. The Debtors were insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

In the Joint Pretrial Statement, the Debtors admitted that they were insolvent at the time they purchased the Annuity. [Finding of Fact No. 12.] Therefore, the ninth badge of fraud is present.

### x. The transfer occurred shortly before or shortly after a substantial debt was incurred.

The Debtors failed to file their personal tax returns for tax years 1995 through 1999. Prior to the filing of the Debtors' Chapter 7 petition, the IRS placed a tax lien on the Debtors' homestead for their failure to pay taxes. [Finding of Fact No.15.] Mr. Bossart testified that the Debtors' pre-bankruptcy planning only commenced after their negotiations with the IRS regarding payment of back taxes had collapsed, and he further testified that the Debtors were worried that the IRS was going to take their house and all of their personal property. [Finding of Fact No. 16.]

The Trustee argued that the Debtors' realization that they were in jeopardy of losing their house and their personal property is equivalent to incurring a substantial debt. The Trustee seems to be arguing that as a matter of law, a debt is not incurred until debtors understand that they cannot

avoid paying a debt. The Trustee has provided no law supporting his position, however; by contrast, the Fifth Circuit has stated clearly that a tax debt is incurred at the time payment is due. *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988); *see also Calmes v. United States*, 926 F.Supp. 582, 590-91 (N.D. Tex. 1996). In the case at bar, the Debtors incurred their debt to the IRS from 1996 to 2000—at least five years before transferring funds to AIG. The Court finds that the transfer did not occur shortly before or after a substantial debt was incurred, and therefore the tenth badge of fraud is not present.

### xi. The transfer was done just prior to the filing of the Debtors' bankruptcy petition.

The Debtors transferred funds in the amount of $102,915.00 to AIG on March 16, 2005, two days before filing the petition; the Debtors also transferred funds in the amount of $5,500.00 to AIG on March 18, the same day they filed the petition. [Finding of Fact Nos. 5, 8.] A transfer made two days before filing a petition constitutes a transfer made just prior to the filing. *Sissom*, 366 B.R. at 698 (holding that a transfer made within 90 days of the filing of a petition constitutes a transfer just prior to the filing); *In re Lacounte*, 342 B.R. 809, 812-16 (Bankr. D. Mont.2005) (holding that a transfer made more than three months before filing constitutes a transfer just prior to the filing). The Debtors agree that the transfer was done just prior to the filing of their bankruptcy petition. [Finding of Fact No. 13.] Therefore, the eleventh badge of fraud is present.

### xii. The Debtors are unable to explain the disappearance of assets.

The Trustee does not contend that the Debtors are unable to explain the disappearance of assets, nor is there any evidence indicating that the Debtors are unable to do so. Therefore, the twelfth badge of fraud is not present.

28

### xiii. The Debtors have engaged in a pattern of "sharp dealing" prior to bankruptcy.

Black's Law Dictionary does not specifically define "sharp dealing," but it defines "sharp practice" as "unethical action and trickery, esp. by a lawyer," adding that the term has the archaic meaning of "unhandsome dealing." BLACK'S LAW DICTIONARY 1381 (7th ed.1999). Webster's Dictionary defines "sharp practice" as "the act of dealing in which advantage is taken or sought unscrupulously." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1074 (10th ed.2001).

During the two weeks prior to filing bankruptcy, the Debtors engaged in a number of questionable acts. They liquidated nearly all of their nonexempt assets–the Fifth Third Account, the trailer, and the bulk of the Wells Fargo Account—and transferred the proceeds into the exempt Annuity. Although the Annuity was exempt, it was not scheduled to pay out until 2033, when the Debtors would be both over 90 years old. [Finding of Fact No. 5.] The Debtors testified that because they could withdraw money from the Annuity without penalty, they intended to use the Annuity not for retirement purposes but rather as a de facto bank account, withdrawing money for expenses as needed. [Finding of Fact No. 6.] Additionally, in the two days before filing their Chapter 7 petition, the Debtors (1) converted $1,500.00 from the Wells Fargo Account into traveler's checks; (2) prepaid a $960.00 auto insurance premium; and (3) withdrew $2,373.00 in cash from the Wells Fargo Account to pay for future bills. [Finding of Fact No. 49.]

The Debtors retained the services of Guettermann for both pre-bankruptcy and bankruptcy advice, but despite signing their schedules under penalty of perjury, they failed to disclose all of the property they owned, or all of the transfers they had made prior to filing their petition. They did not even tell Guettermann about the $5,500.00 transfer from the Wells Fargo Account to AIG. [Finding

of Fact No. 22.]  They did not disclose the conversion of $1,500.00 from the Wells Fargo Account into traveler's checks, the withdrawal of $2,373.00, or their $3,200.00 membership in Thousand Trails until one month *after* the close of trial. [Finding of Fact Nos. 49, 50.]  They took all of their nonexempt assets and used them for their own purposes—spending all of the cash, keeping the Thousand Trails membership, trading in the Oldsmobile, and keeping the MG at a friend's barn—instead of turning them over to the Trustee.

Moreover, the Debtors testified that they filed bankruptcy to protect their personal property from the IRS, and they bought the Annuity to keep money away from their creditors and the Trustee. [Finding of Fact No. 14, 16.]  Indeed, Ms. Bossart testified that she believed that their pre-bankruptcy planning, in which they liquidated their assets into an exempt annuity and paid their creditors nothing, was unfair. [Finding of Fact No. 34.]

The actions of the Debtors leave much to be desired.  The Court is particularly dismayed by the Debtors' failure to make full and complete disclosure (to the Court, to the Trustee, and even to their own lawyer), the Debtors' admission that their actions were not fair, and the Debtors' admission that the purchase of the exempt Annuity was a sham because they never intended to use it for their retirement.  The Court finds that the Debtors engaged in a pattern of sharp dealing prior to filing bankruptcy, and therefore the thirteenth badge of fraud is present.

### Summary: eight of the thirteen badges of fraud are present in this case.

The Trustee has established that eight badges of fraud are present in this case.  There is no magic number of badges that conclusively establishes fraudulent intent; but a concurrence of several

badges of fraud in the same case makes a strong argument for fraud. *See Roland*, 838 F.2d at 1403; *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007, no pet.).

The evidence shows that the Debtors engaged in a variety of actions to keep property away from their creditors. They purchased the Annuity two days before filing their bankruptcy petition, but failed to disclose all of the related transactions on their schedules or SOFA. They made no affirmative efforts to disclose these details regarding the Annuity during the creditors' meeting, and even kept information about the Annuity from their own bankruptcy counsel. They failed to disclose the full extent of their personal property on their schedules, making substantial new disclosures in the middle of trial and one month after the close of trial. They failed to turn over any of their nonexempt property to the Trustee; instead, they kept it or spent it. Additionally, they admitted that their purchase of the Annuity was not truly for retirement purposes: they could withdraw from the Annuity at any time without penalty, and they intended to treat it as a bank account, taking money out for expenses as needed. Finally, the Debtors admitted that their course of conduct—keeping all of their personal property without turning over a dime to their creditors—was not fair.

The Court finds that the Trustee has met his burden to show that the Debtors transferred money to AIG with the intent to hinder, delay, or defraud a creditor. Therefore, the third element of § 548(a)(1)(A) is satisfied. Because all elements of 11 U.S.C. § 548(a)(1)(A) have been met, the Trustee is entitled to recover the value of the nonexempt funds that were used to purchase the Annuity, including interest. *Ackerman v. Schultz (In re Schultz)*, 250 B.R. 22, 33 (Bankr. E.D.N.Y. 2000).

The Trustee has demonstrated that the Debtors used $108,415.37 in nonexempt funds to purchase the Annuity. As previously discussed, this amount represents $90,915.37 (from the Fifth

31

Third Account) + $12,000.00 (from the sale of the trailer) + $5,500.00 (from the Wells Fargo Account). Therefore, the Trustee may recover $108,415.37, plus any accrued interest.

### 2. The Trustee's alternative theory under § 548(a)(1)(B)

In order to recover the Funds under § 548(a)(1)(B), the Trustee must show four elements: (1) the Debtors made a transfer; (2) the transfer was made on or within one year of filing the petition; (3) the Debtors received less than a reasonably equivalent value in exchange for such transfer or obligation; and (4) the Debtors were insolvent on the date that such transfer was made or such obligation was incurred.[18] *In re GWI PCS 1 Inc.*, 230 F.3d 788, 805 (5th Cir.2000) (citing *In re McConnell*, 934 F.2d 662, 664 (5th Cir. 1991)).

#### a. Was there a transfer of interest of the debtor in property?

The parties have stipulated that the payments to AIG constituted a transfer as defined in 11 U.S.C. § 101(54). [Finding of Fact No. 9.] Therefore, the first element is met.

#### b. Was the transfer made on or within one year before the date of the filing of the petition?

The Debtors made the payments to AIG on March 16, 2005 and March 18, 2005, and filed their petition on March 18, 2005. [Finding of Fact Nos. 5, 8, 10.] Therefore, this transfer was made within one year before the filing of the petition, and the second element is met.

#### c. Was the transfer made in exchange for less than a reasonably equivalent value?

Section 548 defines "value," for the purposes of that section, as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise

---

[18] Section 548(a)(1)(B) provides three additional grounds for the fourth element, but the Trustee has not argued any of these grounds, nor are they relevant to the case at bar.

to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The Trustee argued that the qualifying phrase "does not include an unperformed promise to furnish support to the debtor" gives the word "value" a unique meaning under § 548, and because an annuity is nothing more than a "promise . . . to provide a series of future payments," an annuity has no value in the context of § 548. [May 29, 2007 Hr'g Tr. 15.]

In the Fifth Circuit, the test for whether a transfer was made for reasonably equivalent value under § 548 is "whether the transfer conferred an economic benefit on the debtor." *In re Hannover*, 310 F.3d at 802 (citing *In re Fairchild Aircraft Corp.*, 6 F.3d at 1127). The Fifth Circuit has further stated that "consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one . . . is to be determined at the time of purchase." *In re Hannover*, 310 F.3d at 802 (holding that a transfer of short-term call options to a party who proved unable to exercise them was sufficient to confer value). Any number of cases have established that an annuity has a present economic value or confers some present economic benefit. *See, e.g., Arizona Governing Committee v. Norris*, 463 U.S. 1073 (1983), *Kerr v. Comm'r Internal Revenue*, 292 F.3d 490 (5th Cir. 2002); *Estate of McClendon v. Comm'r Internal Revenue*, 135 F.3d 1017 (5th Cir. 1998).

On March 16, 2005, Ms. Bossart purchased the Annuity from AIG for $102,915.37. After subtracting AIG's 3.5% sales charge of $3,602.03, the value of the Annuity at the time of purchase was $99,313.34. [Finding of Fact No. 5.] Pursuant to the terms of the contract, AIG also imposed a 3.5% sales charge on the Debtors' $5,500.00 transfer of March 18, 2005, resulting in a deposit of $5,307.50 into the Annuity. Thus, as of the petition date, the value of the Annuity was $104,620.84

($99,313.34 + $5,307.50). Under the terms of the Annuity, Ms. Bossart could withdraw any amount of funds from the Annuity at any time thereafter, without penalty. [*Id.*]

The Debtors also introduced expert testimony from Kenneth Lehrer, an economist and retired professor of finance at the University of Houston. Lehrer testified that an annuity was an investment—a financial instrument sold for equivalent market value. Lehrer further testified that as of the time of purchase, the annuity had a value of at least $108,415.00. [19] [Finding of Fact No. 38.]

The Trustee has failed to produce any case law supporting his contention that an annuity should be characterized as a mere promise to make a series of future payments and therefore has no value in the context of § 548. The Court finds that the value that the Debtors received at the time of purchase ($104,620.84, plus a contractually guaranteed future income stream and the contractual ability to withdraw any amount of funds from the Annuity at any time, without penalty) was reasonably equivalent to the value of the asset transferred ($108,415.37 in cash). *In re Erlewine*, 349 F.3d 205, 211-12 (5th Cir. 2003) (holding that "that the question of reasonable equivalence is usually a question of fact, or is at least fact-intensive") (citing *Tex. Truck Ins. Agency v. Cure* (*In re Dunham*), 110 F.3d 286, 288-89 (5th Cir. 1997)); *In re Fairchild Aircraft Corp.*, 6 F.3d at 1125 (holding that "[a]lthough the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent"). Therefore, the third element is not met.

---

[19] Lehrer's testimony, while credible, was not necessary for the Court to reach its conclusion. The Annuity documents speak for themselves.

### d. Were the Debtors insolvent at the time the transfer was made?

In the Joint Pretrial Statement, the Debtors admitted that they were insolvent at the time they purchased the Annuity. [Finding of Fact No. 12.] Therefore, the fourth element is met.

### Summary: The Trustee has failed to meet his burden of proof on § 548(a)(1)(B).

Because the Trustee has failed to prove that the third element is met (i.e., he has failed to show that the Debtors' transfer to AIG was made in exchange for less than reasonably equivalent value), he has not met his burden of proof with respect to § 548(a)(1)(B). The Trustee, therefore, may not recover the Funds under § 548(a)(1)(B); he may only recover the Funds under § 548(a)(1)(A).

### C. The Debtors' Reliance on Advice of Counsel

It is well established in the Fifth Circuit that when a debtor "acts on the advice of counsel, after a full disclosure of the facts to him, fraudulent intent may be presumed to be absent." *Dilworth v. Boothe*, 69 F.2d 621, 623 (5th Cir. 1934); *see also Goodman v. Curtis*, 174 F. 644, 646-67 (5th Cir. 1909) (holding that a debtor who fills out schedules incorrectly on the specific advice of counsel is not necessarily barred from amending those schedules). But a debtor may only assert reliance on attorney advice as a defense to fraudulent intent when such reliance is reasonable and in good faith. *Gartner*, 326 B.R. at 374 (citing *Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991)); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 876 (8th Cir. 1988); *see also FDIC v. Sullivan* (*In re Sullivan*), 204 B.R. 919, 943 (Bankr. N.D. Tex. 1997). A debtor who fails to make full disclosure to counsel may not assert a reliance-on-counsel defense. *Dupre v. Schott* (*In re Dupre*), 145 Fed.Appx. 855, 856 (5th Cir. 2005) (unpublished table decision) (citing *Dilworth*,

35

69 F.2d at 623). Nor is such a defense available when advice of counsel is "given on a question of fact, which the [debtor] can decide for himself." *Dilworth*, 69 F.2d at 623.

Because a debtor attests to the truth and completeness of statements and schedules under penalty of perjury, "he must accept responsibility for the information in the statements and schedules," and may not argue that he simply signed what his counsel prepared. *Dreyer*, 127 B.R. at 597. Evidence of a debtor's intent to omit information from the bankruptcy petition also undermines an assertion of good faith reliance upon advice from counsel. *Gartner*, 326 B.R. at 374-75 (holding that a debtor's false statements at a deposition and amendment of schedules only after inaccuracies were revealed at a deposition evidenced a lack of good faith reliance on advice of counsel); *Dreyer*, 127 B.R. at 597-98 (holding that a debtor's intentional failure to list numerous assets of substantial value or transactions with which he was intimately familiar evidenced a lack of good faith reliance on advice of counsel).

The Debtors failed to reveal all of the transfers relevant to the purchase of the Annuity until the trial was half over [Finding of Fact No. 47], and did not disclose the existence of nonexempt property worth thousands of dollars until one month after the end of trial. [Finding of Fact No. 50.] They did not turn over a penny to the Trustee. The Debtors characterized these failures as an "honest mistake." The Debtors further contend that they simply followed the instructions of their attorney and never had any intention of concealing anything from the Trustee or the Court. Indeed, they allege that their subsequent filing of amended schedules and SOFAs demonstrates their good faith, because if they had not amended their schedules, the Trustee never would have learned the truth.

The Debtors were not well served by their bankruptcy attorney, Guettermann. He testified that he did not instruct the Debtors to list checks on their schedules or SOFA because he did not

36

believe that writing a check was a transfer. [Finding of Fact No. 27.] He did not instruct the Debtors to turn over nonexempt property because it was not his practice to advise clients to turn over nonexempt property unless the trustee first asked for it. [Finding of Fact No. 29, 31.]

The Debtors, however, did not make full disclosure to Guettermann. They did not tell him about the $5,500.00 transfer from the Wells Fargo Account to AIG on the same day they filed their petition; Mrs. Bossart testified that they made the transfer of their own accord. [Finding of Fact No. 22.] Nor did they tell him that they had taken one of their non-exempt cars and, instead of turning it over to the Trustee, traded it in for a new car. [Finding of Fact No. 30.] At trial, Guettermann could not recall the specific advice he had given the Debtors regarding how much money they should keep in cash or their checking account, but he did tell them that all non-exempt property belonged to the estate and could be taken by the Trustee. [Finding of Fact No. 35.] Guettermann added that while he had helped the Debtors fill out their Schedules, it was their duty to ensure that their Schedules were complete and accurate, and they had signed them under penalty of perjury. [Finding of Fact No. 37.] In that the most recent financial disclosures came one month after the last day of trial, the Court presumes that the Debtors also failed to inform Guettermann that on the day they filed their petition they had withdrawn $1,500.00 in traveler's checks from the Wells Fargo Account; that two days before they filed their petition they had withdrawn $2,373.00 in cash from the Wells Fargo Account to prepay their auto insurance and credit card bills and pay for their utilities; or that less than one year before filing bankruptcy they had given their daughter a $1,000.00 housewarming gift.[20] [Finding of Fact No. 49.]

---

[20] Whether the transfer to the Debtors' daughter could be avoided was not argued at trial—perhaps in part because the transfer was not disclosed until one month after trial. Without deciding the issue, the Court notes that pursuant to § 547(b)(4)(B), the Trustee may avoid any transfer of property to an insider within one year of the petition.

The Debtors testified that they considered the Annuity to be Ms. Bossart's retirement money, willed from her mother for that specific purpose. [Finding of Fact No. 25.] Yet, the Annuity was not purchased until two days before the Debtors filed bankruptcy, and would not start paying out until the Debtors were both in their 90s. [Finding of Fact No. 5.] Ms. Bossart admitted that because they could withdraw money from the Annuity without limitation and without penalty, they intended to treat the Annuity as a bank account, withdrawing from it at will to pay for expenses. [Finding of Fact No. 6.] Ms. Bossart also conceded that she did not think it was fair for them to keep all of their property, including the Annuity, and pay nothing to creditors. [Finding of Fact No. 34.]

The Court concludes that the Debtors did not rely on Guettermann's advice in good faith. They did not disclose to him complete and accurate details regarding their personal property or their pre-petition transfers. Guettermann informed them of their duty under the Code to disclose all relevant financial information; he further informed them that all nonexempt property belonged to the estate, and that they were signing their schedules and SOFA under penalty of perjury. Moreover, the Debtors' reliance on Guettermann's advice was not reasonable. Although they may have felt entitled to the money in the Annuity, Mrs. Bossart testified that they knew that what they were doing was not fair.

Because the Debtors did not rely on Guettermann reasonably or in good faith, their reliance is not a defense to fraudulent intent.

## IV.    Conclusion

The Court is cognizant that the case at bar was filed before the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), and that under the pre-BAPCPA Code,

pre-petition planning to enhance exemptions was considered appropriate. *In re Sissom*, 366 B.R. at

678. Indeed, this Court has previously noted that:

> [T]he legislative history of the Bankruptcy Code encouraged such planning: "As
> under current law, the debtor will be permitted to convert nonexempt property into
> exempt property before filing a bankruptcy petition. The practice is not fraudulent as
> to creditors, and permits the debtor to make full use of the exemptions to which he
> is entitled under the law."
>
> *Id.*, 366 B.R. at 678 (quoting H.R. Rep. No. 95-595, at 361 (1977), as reprinted in
> 1978 U.S.C.C.A.N. 5963, 6317 (citation omitted)).

A debtor's conversion of nonexempt assets into an exempt annuity, even on the eve of

bankruptcy, is not necessarily fraudulent as to creditors. *See In re Bowyer*, 932 F.2d at 1102 (5th Cir.

1991); *Soza v. Hill* (*In re Soza*), 358 B.R. 903, 909 (S.D. Tex. 2006). Of course, some conversions

of nonexempt assets into exempt property are fraudulent; otherwise, there would be no need for §

548. *In re Bowyer*, 932 F.2d at 1102 (citing *First Texas Savings Ass'n, Inc. v. Reed* (*In re Reed*), 700

F.2d 986, 991 (5th Cir. 1983)).

In the case at bar, the Debtors transferred money into the Annuity as part of a course of

conduct designed to keep money away from their creditors. They did so in violation of both the

letter and the spirit of the Code. They failed to disclose the full extent of their personal property on

their schedules, and instead of turning over their nonexempt property to the Trustee, they kept or

spent it. They failed to disclose all of the transfers relating to the purchase of the Annuity on their

schedules or SOFA. They failed to make full disclosure about the purchase of the Annuity to the

Trustee at the creditors' meeting. They even failed to tell their own counsel about the $5,500.00

transfer from the Wells Fargo Account made on the day they filed bankruptcy. And, although they

initially contended that they purchased the Annuity to provide for their retirement, the Annuity

would not start paying out until 2033, when both of the Debtors would be in their 90s. Under oath, the Debtors admitted that they did not expect to be alive in 2033, and that they planned to withdraw money from the Annuity whenever they needed it. In short, the Debtors purchased the Annuity not as a retirement account, but as part of a plan to keep money away from their creditors until after they received a discharge. The Bankruptcy Code exists to give debtors a fresh start—not a head start. *In re Kleibrink*, 346 B.R. 734, 753 (Bankr. N.D. Tex. 2006) (citing *In re Godios*, 333 B.R. 644, 647 (Bankr. W.D.N.Y. 2005)). Here, the Debtors have attempted to obtain a head start, which this Court will not countenance.

The Trustee may avoid the purchase of the Annuity as a fraudulent transfer pursuant to § 548(a)(1)(A), and may recover the Funds currently held in the registry of the Court, plus any accrued interest. An order consistent with this Memorandum Opinion will be entered simultaneously on the docket.

Signed on this 21st day of December, 2007.

Jeff Bohm
U.S. Bankruptcy Judge